Good afternoon, Your Honors. My name is Howard Kollitz. I'm accompanied this afternoon by Kim Tung. We are lawyers with the firm of Danning, Gill, Diamond & Kollitz, LLP. We represent the appellant in this matter, Richard K. Diamond, in his capacity as the Chapter 7 trustee serving in the bankruptcy case for automotive distributing for the Far West. If it pleases the Court, I'll refer to the debtor entity in the bankruptcy case as either ADF or the debtor. I think that our briefs, our principal brief and our reply brief adequately set forth our arguments, adequately document and explain the numerous reversible errors that occurred during the course of the proceedings before the bankruptcy court. If it please the Court, I would like to reserve most of my time for rebuttal and without in any way trying to appear presumptuous, indulge the Court perhaps very briefly with some comments concerning a suggested approach to the resolution of the matter before Your Honors. It is not in dispute on this appeal that it has been determined that if the trustee is able to prove that ADF or the debtor at particular points in time was insolvent, that the trustee is entitled to a money judgment on certain of his claims under Section 547 of the Bankruptcy Code against the appellees Thomas Jeffers and Eva Jeffers. Well, let's stop right there and tell us exactly what you think the definition of insolvency is to be applied in this case. Well, it is set forth in Section 101, and essentially it is a balance sheet test. It is assets at a fair value with exceeding liabilities with certain notable exceptions as set forth in the Code. And this Court, I believe, has in the past told us that there's – it's really a two-step process for purposes of determining insolvency. First, the trial judge should figure out whether or not he's got a situation where the debtor entity was a going concern or whether it was on its deathbed. And depending upon that determination, you move into the second area of inquiry, which is that if it was a going concern, then the asset should be – then the assets should be valued at a fair market value, and there's definitions that this Court has set forth concerning what that means. If it's determined that the debtor entity was on its deathbed, then you would use what are commonly referred to as liquidation analysis. Kagan. Well, the issue seems to turn on whether certain – some that was moved from one company to the other should be concerned, treated as an equity or as a debt. I mean, that's kind of the guts of where this is, isn't it? Well, I think Your Honor has put your finger on it, and that was where I was going, and that is that we're talking about the secured $1 million interest-bearing promissory note that the debtor issued to an affiliated entity, Daytona Ignition Products, controlled by the same people, the Jeffers and their son, Peter Osborne. And the Bankruptcy Court, in its insolvency analysis, determined quite clearly and erroneously that that promissory note for $1 million was always intended to be equity. And the Bankruptcy Court – and therefore, it is excluded from the liabilities. The Bankruptcy Court then proceeded to go through its analysis and concluded that ADF, the debtor, was solvent to the extent of $731,000, and that is without regard to the $1 million secured interest-bearing promissory note that the debtor, or ADF, had issued to its affiliated entity, Daytona. Well, what's our standard review of the Bankruptcy Court's action in this case? Well, it depends, Judge, on what issue you're focusing on. If you're focusing on the issue – Reclassification of debt. The classification of – Reclassification of debt. Recharacterization. I would suggest to you, aside from getting into the issue of whether or not it's appropriate to employ the doctrine of recharacterization, I would suggest to you that that is a legal issue and that this Court reviews that issue de novo. And in that regard, as long as you – Well, I guess why I'm asking that is that we had two experts here, and there's some – quite a bit of dialogue about what each expert looked at and what their qualifications were. And it appears, I believe, the expert for – I'm going to say for Osborne, Rene – I think that's – Rene. Rene. Rene. Whatever, Rene. It appears that her analysis as an auditor was used by the Bankruptcy Court in making its decision in recharacterizing the debt transactions. And you have to admit that it was rather – being charitable, rather – it wasn't bizarre, but it was rather interesting the way they moved stuff around in the documentation. So what do we do? Do we ignore the experts? And it's a pure legal matter. Do we look at the experts in their analysis as auditors? And your expert was also very, very knowledgeable in the auto parts business and whatever. Do we look at those inputs that they put into the – that they gave to the bankruptcy judge? And then do we say he was clearly erroneous in taking that information? Because you can look at all this stuff, and you can go almost anywhere you want to, I suppose. I could look at the first note that was issued and say, hey, it's a note. Forget about it. So how do we analyze that? Here's how I suggest Your Honors approach it. First of all, the bankruptcy judge did not undertake any recharacterization. The bankruptcy judge analyzed the facts and concluded on the evidence in the record before him that the secured, interest-bearing, promissory note issued to Daytona for a million dollars was always, always intended to be equity. And in the record – And he got there by using the experts up and the input that they gave him. He got – he – well, what he said was that – well, he went through an analysis of how he reached that point. And he started out by saying that the Bank of America dictated the course of this transaction. No, I know. But he's doing it because he's factually reviewing the records, and he's also using the experts to help interpret the facts. Well, the record shows – the record shows, Your Honor, that Ballinger, our expert, looked at a number of things. Well, I understand that. But first of all, this determination that it was always intended to be equity was a factual determination. Yes. And if it's a factual determination on the standard, in answer to your previous question, it would be clear error. Okay. So we're going to look at the same facts, and we're going to say it's clearly erroneous in order to give you your position. And in fact, what you said in your brief was, look at my expert. I mean, he's right on target. Mr. Renna was not on target. She didn't even know what she was talking about. Well, we didn't use – we didn't use the expert for purposes of trying to establish the clear error. What we pointed out to the Court was a number of things that are not in dispute. First, there's a pretrial order that was in – that's in existence that the Jeffers signed off on, agreed to, and also that Daytona Ignition Products, another defendant in Canadian Abrake, another party who have chosen not to file briefs, signed off on. And in that pretrial order, in that pretrial order, it's agreed that this – that ADF signed a secured promissory note in favor of Daytona Ignition Products. And you go beyond that in the pretrial order. These are admitted facts before we're starting the proceeding. You go beyond that. In the pretrial order, it's also admitted that in October, October 6, 1995, that there is a board meeting. The minutes are signed by the appellee, Eva Jeffers, and her son, Peter Osborne, who controls both ADF and Daytona, that the previous issuance of stock to Daytona is void ad initio, and that the million-dollar secured interest-bearing promissory note is reinstated. It was never, never – this is a written admission. It was never the intention that it be equity. It was always the intention that Daytona be paid for. And District Judge Morrow, okay, looked at that and also looked at underlying evidence, pointing out, pointing out carefully that she was not assessing or reassessing the credibility of any witnesses, because there really was no testimony, okay, and an appellate court is in just as good a position as the trial court to assess the meaning of the documents. And what are these documents? Well, this is besides the admission set forth in the pretrial order. We have an evidence without objection, the promissory note that is interest-bearing, provides for a maturity date, provides for periodic payments. Well, I think we can read between the lines. At some point, they thought that Bank of America was requiring them to have a certain amount of equity, so they probably issued the stock, and then they decided they didn't have to do that, so they take it all back. Absolutely. And Judge Morrow picked that up right away as well. What Judge Morrow pointed out was it starts out in October 1 of 1994, and the insiders characterize the note to date. They create a note, and it's a liability. Then they have this dispute or dialogue, however you want to characterize it, with their then-existing lender, Bank of America, and appellee Thomas Jeffers, who's also serving as a lawyer to the company, writes to the Bank of America, and these documents are in evidence, and he says, the note's canceled. Feel better. Now it's equity, okay? Well, the loan that Bank of America made in October 1, 1994, by its terms, expired September 30, 1995. So now you fast-forward it to September 30, 1995. The $3.2 million is due to the Bank of America, and on the same day, and the Bank of America now starts to undertake to collect its receivables, and on the same day that Daytona and the debtor, ADF, and its principal, Mr. Osborne, and I think others, other affiliated entities, file a lawsuit against the Bank of America and bank officers seeking to stop the collection of a collateral, banks, collateral, and the enforcement of a loan, they hold a meeting of the board, and those minutes are in evidence, and Judge Morrill saw those minutes, and those minutes are signed by the appellee, Eva Jeffers. They're signed by Peter Osborne, and they make it clear it was never intended to be equity. It was always intended that Daytona get paid. Let me ask you, what lie do we believe? This is a closely held corporation.  They start out issuing stock, and then they renege to not stock, only to play with their creditor. What are we supposed to believe? You have to analyze all that, because wherever the bouncing ball stops, you get an answer. But how do we stop the bouncing ball? Which one do we believe? Isn't that what the experts did? Didn't they analyze this thing in an accounting standpoint, said this is what they did, and this is what they did? Put the input into the bankruptcy judge. He made credibility determinations, and he got an answer. All you're saying is that one document is where he stopped the ball. Minutes. It's closely held manipulation, wasn't it? Yes. Yes. Closely held manipulation. Yes. Okay. So how do I analyze it? Do I take those documents at face value, and which one? Here's how you analyze it, with all due respect. First of all, the experts. I'm having a problem, because when we're told in a closely held corporation where they're manipulating something, that this document is it, I want to know how I can get there, because I don't know where the manipulation is. Well, essentially it's apparent, the record's apparent, that that's exactly what occurred. A fraudulent game of musical chairs with liabilities, designed first to mislead Bank of America, then Deutsche. We've all been there. But, but, but, if you look at actually of the testimony of the two experts, they don't dispute that it was a liability. They are in agreement that it was a liability. Rayner's testimony is that if it's a liability, if it's a liability, it's a subordinated liability. And I submit to Your Honors, we don't care if it's a subordinated liability. A debt is a debt. That was her testimony. As Judge Morrow pointed out, she was never asked, would you recharacterize this as equity. There was no testimony at all on the issue of it being equity. Eva Jeffers took the stand. She testified concerning another promissory note. She testified concerning some other matters. She tested, she submitted no testimony at all as to why this written admission shouldn't be given effect. Her written admission given effect. The fact of the matter is that both experts agreed it was debt. It was a question of how, of how it was going to be treated, whether it was going to be subordinated debt. And that's what Rayner answered in response to my hypothetical question to her. And our experts looked at a promissory note in the records of the company, looked at a security agreement, looked at canceled stock certificates, okay, looked at the written admissions of the defendant insiders and said it's a liability. If you were a potential buyer of the business, you'd look at it and you'd say it's a liability. I think where that leads us, at least it kind of got me into another swamp, and that was whether or not a bankruptcy judge, in this case the district court, can re-characterize the debt. And that goes into the equitable principles with regard to bankruptcy because you can fight all this out and then we get to experts and experts and the record as you've laid out and say what does that mean? Does the bankruptcy court or the, or for this matter, the district court, under its equitable powers in the bankruptcy, take this situation as you've just described and can they, can they legally re-characterize? The answer is no, and I will tell you why. First of all, Judge, District Judge Morrow. Where did she make her error then? Pardon me? Where did she make her error? Where she made her error was she got to the point where she said I'm looking at this record and it's clear error. On a factual basis, this is a liability. It's right there. It's clear in her opinion. The disaster that befell us was on a matter which was not tried before the bankruptcy court, not the subject of the pretrial order, never raised by the appellees, not even before the district court. And after the matter stood submitted on the court's own initiative, Judge Morrow undertook to say that does not end my inquiry. Bankruptcy courts look to decide what the true character of the transaction is through the equitable doctrine of re-characterization. And where she went wrong was there is not a single case that Your Honors will find where the doctrine of re-characterization has ever been used for the benefit of an insider in the context of bankruptcy proceedings. Well, you're right there. This is a very strange result. I mean, if you look at the overall picture, the insider got the benefit of this, and that's why I couldn't figure out what the payoff was. Well, it's a, it's a, well, when I use the word disaster, for example, if this court were to embrace the notion that the doctrine, equitable doctrine of re-characterization applies in a situation where a bankruptcy trustee is going about the difficult task of trying to recover from insiders avoidable transfers, you give the benefit to the insiders who are manipulating the books, manipulating the companies, of two bites. First bite is they can say we're going to take a lien on all the assets, and therefore, if anything goes wrong, we're going to get everything. And then if there's a problem with that, our fallback position is that we'll argue to a court, well, there should be equitable, there should be equitable re-characterization of the debt. I might add, by the way, that although this Court is not bound by what the bankruptcy appellate panels do, there is a bankruptcy court appellate panel decision, which we cited in our brief, that points out, I think, correctly, that the doctrine of re-characterization has no place in bankruptcy. Well, apparently, we're going to face a circuit split when we decide this. So, I mean, there are indications maybe other circuits have addressed this. That's true. So it's going to be a tough one. Right. The fact is, Your Honor, is right. There are cases out there that say there is a split in the circuits, and they look to the BAPT decision to say, and in the Ninth Circuit, they don't apply the doctrine of re-characterization. But let's assume for discussion purposes that the doctrine of re-characterization you decide you want to apply the doctrine of re-characterization for the benefit of defendant insiders trying to avoid liability to a bankruptcy trustee, when, historically, it's never been used in a bankruptcy context by anybody, let's say, other than bankruptcy trustees, and the cases cited by Judge Morrow point this out, bankruptcy trustees that are trying to disallow claims of insiders, in other words, trying to prevent insiders from getting unfair advantage, or creditors committees trying to subordinate claims of other creditors or re-characterize claims of other creditors because they feel that those creditors should not share equally, or just individual conduct. Even if you assume that you are going to take the doctrine of re-characterization and say that it applies for the benefit of people who I would submit are clearly the least deserving people to get the benefit of this equitable doctrine, it didn't pass the test. It didn't pass the test. In this case, Judge Morrow's opinion is internally inconsistent. The first fact that she looked at to justify equitable re-characterization was that the promissory note issued to Daytona by the debtor was non-interest bearing. And then she goes on into discussion about how that's important. In fact, earlier in the opinion, she correctly found factually that it's not only an interest-bearing promissory note with a payment schedule and so forth, but it's secured by – it was secured by a lien on the assets of the debtor – of the inventory of the debtor. Scalia. So you're running out of time. Carvin. All right. Sotomayor. Why, it's two minutes over. Carvin. All right. Well, then I'll reserve what little time I have left, if I may, for rebuttal. Sotomayor. I don't think you have any. Carvin. I don't have any. Sotomayor. You're over two minutes. Well, have I answered all the questions, Your Honor? Yes. Thank you. Good afternoon, Your Honors. My name is Mitchell Ludwig. I represent the athletes, Tom and Eva Jeffers, who are present in the courtroom today. I heard – We know this case. I'm interested in where we got. If we're going to use equitable recharacterization and we're going to go against a VAP decision and create a circuit split to get to your position, how do you use the equity powers in bankruptcy to benefit an insider manipulation? Well, Your Honor, first of all, I would disagree that there was manipulation here for this reason – for this reason, if I may. I'd like to go back, first of all, to the trial court result. What Judge Peterson decided was, based on the testimony and the live witnesses and the documents that he reviewed, was that the company treated that transaction as equity at the time that the preference had to be analyzed. Now, in October, the year before, there was this board meeting. But at the time – I know the record. See, what bothers me is we're dealing with an insider company. It's all insider business. So what you're saying is we have to take those transactions as true, i.e., the note was very true. There's no better note that I've ever seen. And then all of a sudden they issue some stock. And then they renege the stock. So you say the musical chairs, though, stops at the time of the transfer. I say the musical chairs. It's interesting you say that because I did have that on my notes as an analogy. It really has to be looked at at the time that the preference is being analyzed. Because that's when you're really going to – a third party is going to be looking at this and saying, is this equity or is this debt? Who's going to pay them on debt on this note? But it's only fortuitous or planned that the characterization is when the preference happens. I mean, they could have changed at any time because they did. They changed constantly. It's also fortuitous that my clients went to their family and friends and gathered $3 million in order to keep this company from folding in October, put the money in as a bridge loan for a short period of time, and didn't record a UCC1. That was fortuitous. If that had happened, we wouldn't be here today either. I have no problem with that. And I understand what they're trying to do. They were very valiantly trying to make this company go. And there's a lot of big questions whether it was insolvent or not. I guess my problem is the linchpin in this is we're being asked to use the equitable principles of recharacterization to solve this. And we're being asked to use the equitable principles of recharacterization  And we're being asked to use the equitable principles of recharacterization to solve this, because if we don't, we don't get anywhere. Well, you don't have to get there. First of all, you could also look at this from a factual point of view and look at what the experts said about this. Ann Rina, whose credentials were impeccable, she was not impeached. Completely different analysis than what Mr. Ballinger did. Mr. Ballinger used what I've referred to as a patchwork quilt of information taken from various sources to come up with his opinion. And when his opinion wasn't bad enough, he would then extract from Ann Rina's opinions whatever negative information he could find. Ann Rina, on the other hand, was very forthright with the judge, very credible. And she said there's some bad evidence here and there's some bad things here. She pulled $800,000 out of equity. She came up with that. She pulled that out because she thought it was related to that Daytona transaction. And she was trying to balance the books. Remember, you have to look at a balance sheet. You have to balance the books. And she was trying to accommodate for that. And she pulled $800,000 out. So really, if you're looking at that million dollars, it's only a $200,000 issue. And I want to answer your question, because I'm – since I'm skipping around it slightly. I think you can, Your Honor, because if you think about this company in liquidation, the insiders would receive not one penny, even if it was debt. They wouldn't get any dollars on that, because the company would be liquidated. The senior secure creditors and the priorities under the Bankruptcy Code would not allow them. The trustee would seek to reclassify that as equity anyway if they tried to make a claim. There was no claim. There was never a dollar paid on that note. There was no interest paid on that note. It was booked at the time of the preference transaction as equity. It never became debt again. They didn't move it back. And Judge Peterson believed, based on the evidence that he saw, and he was the trier of fact and he looked at the witnesses and he analyzed their credibility, that the reason why it was moving around was because they were trying to satisfy Bank of America in the very beginning. And, again, Daytona was owned by Peter Osborne. I represent the Jeffers. Daytona was wholly owned by Peter Osborne. It was his company. It was his inventory of, I don't know, distributors or automotive parts that he put into the You've just said something that's troubling me. You're saying that if there was an attempt here to get money out for the insiders, that the trustee would bring inaction and prevent that or whatever. Well, if they were liquidating the company. Are you saying that we are doing a needless job here today deciding this issue except making a circuit-split law, possibly, because this is not going anywhere, nobody is getting anything, and there is no real issue here with regard to money and payment of credit? I'm not sure. Because I thought it had to do with the fact, what was unusual about this case, is that if this decision stands, if there are creditors and if there are money, that the creditors are not going to get that money. Is that right or wrong? I'm not sure. I believe the estate is insolvent. So without this decision from a person. What difference does it make, then, if the estate is insolvent, what are we deciding here? I mean, we're deciding a novel issue of law. But what is the net result of all this with regard to this case? Well, the net result is you're going to enter, there's going to be a judgment that could potentially be entered against my clients for about $3 million, which will take their life savings away to give to creditors who probably have long forgotten about this debt. The company itself. I don't care about whether they've forgotten about it. I'm asking what the law means. Is the law, I know what's going to happen if we go the other way. Well, it will put money into the estate. It will put money into the estate to pay Mr. Colitz and his firm and whatever creditors show up and explain this. You're saying those creditors, let's assume that the law tells us that we should not use this equitable recharacterization and your clients did pay the money. Are you saying there's some injustice in that? Or are you saying the law is wrong? I mean, I understand saying we should or shouldn't apply equitable recharacterization. I think that under the facts in this case, there is some injustice here, Your Honor, because what happened here was a very this was a very short-time bridge loan, which my clients borrowed money from others, accepted personal responsibility to pay it back to those others, put it into the company solely to get the company to the point when Deutsche Financial Services could make their security loan, which happened. They took the money back and they paid back the people they borrowed it from, Frontier Bank, Verdugo Bank, their neighbors. There's various parties that were paying. They didn't get the money personally. And now we're going to take $3 million away from them that they never actually got to pay back these creditors. They lost their money, whether you characterize it debt or equity or not. They lost their money, apparently. The Jeffers. Yeah. They've lost their money, right, if it's insolvent. No, the Jeffers are not an equity. They were not an equity holder in the company, Your Honor. My clients were not equity holders in the company. I don't want to get maybe we're a little bit confused on the facts. The Bank of America called their loan sometime in late 1995. The Jeffers, who are the parents of the owner of the company, as well as he's also the owner of Daytona, borrowed about $3 million from their family and friends and banks, personally obligating themselves to repay it. They put the money into the company. The company operated without a line of credit. But didn't it all result in a loan to Osborne, which resulted in a loan back, a shareholder? No, that's a different part. That's the other one. That's a different aspect. Daytona, which was an affiliate company of his, which manufactured automobile parts that were sold, he put a million dollars' worth of inventory into his new company, which was ADF, in order to capitalize it, which was something B of A wanted. And then this bouncing ball issue took place. And in October, after B of A called the loan, there was this board meeting. They scrambled. They said, okay, let's make this a note. They weren't trying to manipulate and rip off creditors. They wouldn't have put the $3 million into the company if that's what they were trying to do. They were trying to save the company. They certainly weren't thinking about bankruptcy law, because if they had talked to me, I would have said, you know, there's a guy like Howard Kolitz who's going to be breathing down your neck in less than a year if you do this. This was a transaction which was taken in good faith, but they never implemented it. They didn't implement the reissuance of the liability. There was documents drafted, but the books and records of the company, including the tax returns, all reflected this as equity. It never became debt again. They never paid any interest on it. No principal got paid down on it. And at the end of the day, if this company was liquidated, Daytona would never have gotten paid any of that money because it was to an insider. Sotomayor, looking at the consequences of this suit, if they are required to pay over the money to the trustee, I assume there are creditor's claims out there that would be repaid with that money? Well, primarily it would probably be Deutsche Financial Services, which took a three-month period to do due diligence on this company, extensively analyze this company, loan $4.5 million to the company. Mr. Ballinger didn't even mention that in his report. They stand to gain primarily, plus the trustee and administrative claims of pursuing the trustee gets a fee, the trustee's law firm gets a fee, Deutsche Financial, which, by the way, is no longer in this business. All the players that were involved have all dispersed to various other jobs all over the country. So, you know, the trustee will find them and send some company a check, the life savings of my client. When they went into the company at the time and they determined the company had a positive net worth, and if I can make a comment about that, which is something I think the briefs don't adequately explain, when a lender, an asset-based lender looks at a company, they're not looking for the highest value of the assets in the company. They're looking for the lowest possible denominator that they can come up with because they want to make sure that their loan-to-value ratio is sufficient that if something goes wrong, they'll get paid back. In an asset-based loan, there's two, a couple of different assets. There's inventory and there's receivables. They don't loan 100% on the inventory and receivables. They discount that from liquidation values even further down to a 55% or an 80% ratio, and then they loan money on it. So this company was analyzed by Deutsche at a discounted value to begin with. Then they loaned less than the value of that. They loaned $4.5 million. This company was worth a lot more than that at the time. And every month that they analyzed this company, every time they went back to the company and counted the inventory, looked at the records, they determined that the company had a positive net worth. What's happening is the trustee brought in Mr. Ballinger, who grabbed pieces of information from various periods of time, a couple years before, a couple years afterwards, and he pieced it together. He didn't analyze this company. This was not an appraisal by Ballinger. You put Ballinger's analysis next to Ann Reena's analysis, and it's night and day. Ann Reena's analysis is very good. She went to the source documents. She looked at the journals. She tried to tie out the financial statements. Ballinger never did that. Let me go back again. I'm with you there. I'm still trying to clarify my mind because I didn't want to confuse you with my questioning before. The Jeffers put money in in this bridge. You made it quite clear, during this Bank of America business. They got from B of A to Deutsche. Exactly. Deutsche. And they needed the bridge loan, so they put their money in, and they got their money out. They borrowed it from family and friends and banks, and then the money was paid back. They were paid out. It came through them into the company, came from the company, threw them back out to those creditors. But the Jeffers got their money back that they put in, or did they? You'd have to break down the $2.63 million that they put in. I think some of that came from their pension fund, and they borrowed it. I guess what I'm saying is what I'm looking at is applying these equitable principles. Did they get their money back? Well, they borrowed money.  Let's stop there. The whole point of this is if the trustee wins, he gets a judgment. He wants to get a judgment against the Jeffers. Correct. And the reason is because there was a transfer to them, allegedly, which was preferential during the period of insolvency. Correct. Now, what was transferred during the so-called period of insolvency to the Jeffers, if anything? Money from the Deutsche Loan, when it funded, was paid from the company to the Jeffers, which the Jeffers then used to repay the loans that they obtained. I got you. I'm clear then. I'm okay. So then the question is, when we analyze applying the equitable principles, are we doing something equitably wrong when we recharacterize the debt to equity that allows Jeffers to get the payment? Well, the Jeffers won't get the payment. There's no money going to the Jeffers here. I understand that. There will never be a dollar going to the Jeffers in this transaction. What will happen is the Jeffers will have to liquidate everything they own in order to pay an additional three million. I understand that, but the equity has nothing to do with the Jeffers. The equity has to do with the creditors and the bank of the state. Okay. I'm just trying to figure out, when you're applying these equitable principles, whether we're doing violence to the creditors, the bankruptcy, whatever. The Jeffers are players. There's no doubt about it. I'm trying to sort that out. I think you've placed me where we are. They did get, if you go into an insolvency position, they did get transfers of money. Where they got the money, what they did with it, I don't know. Because when there's a transfer made, all you're doing is going after the money. You don't care where it went. You just want the money back. It went during that period. And that's what I'm trying to, you see what I'm trying to figure out. Well, will the creditors be harmed by it? That's the issue. Deutsche Financial Services, the company that took advantage of the company and loaned $4.5 million because they thought that the company was a solving company that was operating, that they thought they were going to make money from. They received fees from. They received interest payments from. And it turns out that now they claim that they really didn't analyze the company, that they just loaned $4.5 million to this company without looking at the books and records. And now they're going to take advantage of that to get repaid some dividend on their remaining debt. That's what they want. If the company's not insolvent, and remember, the creditors, you know, a lot of creditors continue to do business with this company. The company continued to be employed for some 20 months. Salaries were paid. Mortgages were paid. Car payments were paid. A lot of people stayed employed. A lot of people made. A lot of things were not paid, however. They weren't paying their payroll tax. There were some operating issues. And there was some slow in pay. There was some slow. But remember, if you read the trial testimony, you'll see there's reasons for that. And Rena and the other witnesses testified about that. The company didn't have an operating line of credit. It's like running a car without oil. You can't run it for very long. So when Deutsche Financial finally put their money back in, now there was the lubricant to get the company going and it started operating. And then Deutsche pulled the plug at the end of the year. I understand that. I guess what's really got me hung up is when we write these things, we want to make it right. We want to do the right. We want to say what's right. And when we're doing this analysis of the equitable powers in bankruptcy, if there was a record that nobody on the back side, the leftover creditors, if you will, that you've talked about, Deutsche, had no problem. If there were none, there would be no equitable issue here because who's going to get hurt if you leave it alone? What we don't know is when we apply these equitable principles, what happens not on the Jeffers side, but on the bankruptcy side. That's what I have to review in the record because I think that's where our equitable, unless I'm wrong, that's where our inequitable analysis is. And you pointed out, Deutsche did their deal. They knew what they were doing, so maybe there shouldn't be any equity in favor of Deutsche. Well, the issue is then, Your Honor, if you take what Deutsche did at the time and you look factually and say, was the company insolvent at the time? Deutsche Financial believed the company was solvent at the time. They thought they had a positive net worth. Well, and there's allegations, and I read in the brief that they did their due diligence, and I think that was found. If they did their due diligence, equity wouldn't say that they should be caught. How do you reverse Judge Peterson, who sat there for three days? He flew in from Montana to listen to this testimony for three days, and he listened to the witnesses. It's got to be clear error. If there's two different opinions about the evidence, how do you say one versus the other as a review in court? Again, what you're saying is until we get to Judge Morrow, things were going fairly well, and then Judge Morrow, and the legal analysis to recharacterize that debt is where the error is in this case. Well, I'm not sure why Judge Morrow made the decision to go in that direction as opposed to just relying upon the documents that existed, which Judge Peterson looked at, which were that at the time of the preferences, the company still had booked this as equity at the time. But, you know, I can't help but believe when she went back and looked at this record that she was imposing some equitable consideration. She thought she was finding another way to get there. Judge Peterson found a factual way to get there. Judge Morrow found a different way to get there. And the bottom line is they both reached the same conclusion, that it would be unfair to find that this company was insolvent at the time of those transfers because it will result in a horrendous result. It's not going to result in a horrendous result for some creditors. I mean, this company, this is $3 million that these people never had. It was never in their pocket. It went back out to other creditors. Trustee didn't sue those other people. He had the Jeffers. Thank you, Your Honor. If there's no other questions, I'll stop. Very well. The matter is submitted and the Court will recess until now.
judges: B. Fletcher, Pregerson, Brunetti